Leslie A. Cohen (SBN 93698)
leslie@lesliecohenlaw.com
J'aime K. Williams (SBN 261148)
jaime@lesliecohenlaw.com
Leslie Cohen Law PC
506 Santa Monica Blvd., Suite 200
Santa Monica, CA 90401
Telephone: (310) 394-5900
Fax: (310) 394-9280

**Proposed** Attorneys for Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO DIVISION

| | |
|---|---|
| In re<br><br>LAW OFFICES OF MASRY & VITITOE,<br><br>Debtors and<br>Debtors in Possession | Case No. 1;09-bk-20447-MT<br><br>Chapter 11<br><br>**SUPPLEMENTAL STATEMENT OF LEGAL AUTHORITIES AND FACTUAL SUPPORT FOR DEBTOR'S MOTION TO APPROVE USE OF CASH COLLATERAL**<br><br>Cash Collateral hearing date: 9/9/09<br>Time: 1:00 p.m.<br>Place: Hon. Maureen Tighe |

TO THE HONORABLE MAUREEN A. TIGHE, UNITED STATES BANKRUPTCY JUDGE:

The Law Offices of Masry & Vititoe ("M&V") ( the "Debtor"), Debtor in Possession in the above captioned case, hereby submits the following supplemental statement of legal authorities and factual support for its Motion to Approve Use of Cash Collateral.

I. **INTRODUCTION**

Debtor's Motion To Approve Use of Cash Collateral (the "Motion") is set for continued hearing on September 9, 2009 at 1:00pm. In anticipation of this hearing, Debtor has attempted to work with Counsel Financial in the hope of reaching an agreement regarding Debtor's use of cash collateral. Based upon correspondence received from Counsel Financial over the Labor Day weekend, attached hereto as Exhibit A, it appears that Counsel Financial will be disputing Debtor's requested use of cash collateral overall and

specifically to paying its professionals as provided in Debtor's proposed budget. Therefore, Debtor makes this supplemental statement to assist the Court in preparing for the upcoming hearing.

## II. DISCUSSION

### a. Case Law Supports the Use of Cash Collateral To Pay Professionals

Debtor anticipates that Counsel Financial will assert that the use of cash collateral to pay professionals is unsupported by case law. However, Ninth Circuit Bankruptcy Appellate Panel case law provides precedent for the position that cash collateral may be used to pay professionals over a secured creditor's objection. See *Security Leasing Partners, LP v. ProAlert, LLC*, 314 BR 436 (9th Circuit BAP 2004). Moreover, *Security Leasing Partners* states that it is unnecessary to make a showing of benefit to the secured creditor under Section 506(c) as a prerequisite to paying professionals from cash collateral. Nonetheless, as detailed below, Debtor's use of cash collateral to pay its professionals is of unquestionable benefit to Counsel Financial as well as to the bankruptcy estate and creditors, as these expenses are necessary for Debtor's business to continue operating and for the reorganization to proceed.

### b. Expenses Subject to Counsel Financial's Objections Are Essential To Debtor's Continued Business Operation

Without the use of cash collateral to pay Debtor's professionals, Debtors will be unable to operate, address litigation claims, and reorganize as this would deny the Debtor the ability to employ and pay critically important individuals, including Jim Vititoe, George Hatcher, Barry Cohen, the company's accountants, and their bankruptcy counsel. The roles and importance of these key players are summarized as follows:

**Jim Vititoe**

Jim is the rainmaker for M&V, one of the best in the world, and brings in the millions of dollars in business that allows the firm to succeed. His experience and track record speaks for itself. The firm's financial difficulties were brought about by litigation, as opposed to lack of business. Despite the many millions spent defending the Masry heirs' actions and other cases, Jim has continued to bring in millions upon millions of dollars in business through his contacts, efforts, and expertise around the globe. His services are essential to the continued operations and success of M&V and he must be paid for his efforts.

**George Hatcher**

An aviation specialist like George Hatcher, an advisor/consultant/strategist for some of the very most important law firms in the United States, has the experience and knowledge to help clients know what to do after the unthinkable happens. George is not a lawyer, but most of his life has been spent with lawyers, as an independent service provider granting him the freedom to advise without fear of reprisal. In the forty-five years he's been consulting, he's worked on every type of case imaginable and some unimaginable. Small cases, huge cases, wrongful death cases, product liability cases, pharmaceutical cases, train crashes, bus crashes, ship injuries, and many others, including of course, aviation cases.

Longstanding inclusion in a close circle of superpower law firms like Girardi and Keese, Engstrom, Lipscomb & Lack, Masry & Vititoe and Podhurst Orseck has been a source of George's on-going education in the warp and weft of behind the scene matters in specialized cases. The combination of his acceptance into this exclusive legal "peerage", the experts he hires, and his experience has educated him to become a canny expert in diverse areas like aviation crisis management. George maintains a long list of active and retired pilots who are checked out on innumerable types of aircraft. Among other things, when on the job, George determines what is known about the crash. From that point on, he orchestrates significant research and networking. Whether a law firm sends him out on a crash case, or a client is requesting George's help, he goes through a specific checklist of criteria to analyze the case's merit. Additionally, George conferences with his pilots who are checked out in a plane like the one he is investigating to answer model-specific questions that may come up in television interviews, client interviews or when conferring with lawyers. George remains well-informed by primary sources so that he is independent of the buzz and bias of media coverage, and when his clients come to him with questions about what happened, George can provide the most accurate, most up-to-date information.

George's exposure--and that of the attorneys he consults for--is global. For example, lawyers who consult George may ask his specialized opinion (or assistance) on cases the lawyers already know are "good" when they are considering practical issues of geographic feasibility. As an example, he was asked about the feasibility of securing visas and permits to put a team on the ground in, for example, Perm (Russia), Iraq, or the Comoros. Ultimately, he makes his recommendation to the firm about taking on the case. Airline tragedies incur a barrage of email and phone calls from all over the world to George and to lawyers he

consults for. Communication alone can be prohibitive--part of the reason why aviation cases are not for everyone. They are costly to take on, and costly to maintain.

When a case calls for special attention, George will advise or interview those families who have requested his help or guidance. In the Tam case of July 17, 2007, George was retained to personally interview 104 families and traveled to Brazil at least 10 times over the course of 12 months. Though he does not offer legal advice (only lawyers do that), he is the source of experiential advice regarding the strategy a family should adopt after tragic circumstance strikes.

Following a plane tragedy, there are often a large numbers of lawyers and runners swarming around the families of victims. Many start knocking on doors and making telephone calls. This is not professional protocol. In fact, in the United States, for the first 45 days following a crash, it is even forbidden by law. George does not knock on doors or make phone calls to people who have not first reached out to him or a firm he represents. But when clients express need for him, he is there with an ever expanding scope of management services, professional attention, expertise, and care.

As the foregoing, and M&V's track record utilizing George's expertise demonstrates, George is a critical element of M&V's success. As a non-owner, outside consultant he must be paid for his time.

**Barry Cohen**

Corporate litigation counsel Barry Cohen's continued involvement with the firm is also an essential component of M&V's continued viability. While the Jackie Masry case as against M&V is stayed, the case goes on against several other defendants. Mr. Cohen cannot simply ignore the court hearings and continuing issues on those other defendants (Or, for that matter, the defendants in the other cases) as M&V will not be in Ch. 11 forever, nor can he sit in the background while orders that could possibly seriously affect M&V take place without his input. He must attend these hearings. He has calls waiting for him from plaintiffs' counsel concerning the status of the bankruptcy and the next moves in the case. Also, Dee Yarnall, counsel for other family members/plaintiffs, has approached him at a conference to discuss the case.

Even though the action against M&V is stayed, Barry should nevertheless be preparing the case as, absent a settlement, the claim will need to be determined in one court or another. He cannot pick up a file like this a week before trial. The same applies with respect to the litigation with the estate of Edward Masry. He is handling 10 consolidated cases and they need to be worked on for that inevitable day when the stay is lifted

or the claims are determined in the bankruptcy court. If these cases are not prepared, then one day the Debtor will be faced with requests for continuing any trial or arbitration dates and there are no guarantees he will be able to get those continuances. Moreover, no attorney can prepare 15 cases for trial overnight.

There is also the possibility that any of the attorneys handling the various actions against M&V will seek relief in the bankruptcy court in the form of adversarial complaints or attempts to lift the stay etc. Counsel Financial opposes the use of estate revenues to pay these claims yet offers no solution or strategy as to who will do the necessary work on the cases and how they will be paid.

Another case being handled by Barry Cohen, the Gonzalez case, may result in a substantial benefit to M&V and to Counsel Financial as the secured creditor. If Counsel Financial does not want to pay Barry to work on that case and go after Gonzalez for what he owes they will be losing an opportunity to recover their own money.

**Bankruptcy Counsel - Leslie Cohen**

M&V's need for bankruptcy counsel to represent it in the chapter 11 case is apparent. The Debtor needs representation to analyze debts, advise and assist in preparation of schedules, represent it in connection with adversary proceedings and contested matters, obtain orders for use of cash collateral an other operational needs, represent it for the meetings with creditors and the US Trustee, formulate and propose a reorganization plan and associated disclosure statement, assist it in the analysis of how to restructure and reorganize, and handle the day to day aspects of being a chapter 11 debtor. Also, Barry Cohen and bankruptcy counsel are currently working closely with insurance company counsel Julie Larsen to obtain an insurance refund estimated at over $300,000. Bankruptcy counsel may be forced to withdraw if it cannot be paid.

Debtor is at a loss to understand why Counsel Financial refuses to acknowledge the need for the professionals to be paid. The firms cannot survive if they are required devote the kind of time this case necessitates without payment. Counsel Financial 's proposal to deny compensation to professionals whose services are essential to the Debtor's business and reorganization puts the professionals, as well as the Debtor, in a position of jeopardy and threatens the reorganization.

### M&V's accountants

Again, the need for the involvement of a professional accounting firm is apparent. M&V needs accountants for preparation of tax returns, assistance in preparation of schedules, financial reporting, and complying with Counsel Financial's many requests for financial information. Again, these professionals are entitled to be paid for their services.

Counsel Financial's request for financial projections is unreasonable. As shown in Exhibit A, Counsel Financial has requested 'detailed' financial projections indicating exactly when monies will be coming in on the Debtor's contingency fee cases. The information Counsel Financial is asking for is unreasonable; there is no way to predict the specific time a fee will come in or be disbursed. The firm's management can give it a reasoned and experienced estimate, but that is all. As a contingency firm, M&V is experienced in navigating the cash flow uncertainties attendant to its practice and the projections offered to last week are the best it can offer under the circumstances. The Debtor believes that Counsel Financial is aware of this as a financier of numerous large contingency practice firms, and that the use of cash collateral is appropriate, indeed, essential, irrespective of the exact dates on which the monies are received.

### III. CONCLUSION

At this time, Debtor is interpreting Counsel Financial's opposition to the use of firm revenues to pay the critical players, and its restrictive attitude about operating expenses, coupled with its unusual and unreasonable demands for financial information that appears virtually impossible to compile, as a message that Counsel Financial wants to close down the firm and put Jim Vititoe into a personal bankruptcy. In addition, Counsel Financial wants to cut salary benefits [car allowances, gas reimbursements, etc.] to the employees who know the cases and continue to work the myriad of details in their day-to-day operation which also puts the firm at risk. Debtor's question is, 'How does Counsel Financial expect to collect their debt if there is no one working at M&V and no cases are being maintained and kept current?" Debtor would appreciate a clear explanation of whether and how Counsel expects M&V to stay in business under its proposed restrictions. Or, if Counsel Financial believes the debtor should liquidate, it should so advise, so that the issue can be presented to the Court and decisions can be made.

Respectfully Submitted,

Dated: September 8, 2009        Leslie Cohen Law, PC


                                By:   _Leslie A. Cohen_
                                      Leslie A. Cohen
                                      Proposed Counsel for Debtor and Debtor in
                                      Possession

## DECLARATION OF JAMES VITITOE

I, James Vititoe, hereby declare as follows:

1. I am over 18 years of age. I am the President of Masry & Vititoe, APC, the Debtor and Debtor in Possession in the above-captioned bankruptcy case. Unless otherwise stated, I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2. I make this declaration in support of the Supplemental Statement of Legal Authorities and Factual Support for Debtor's Motion To Approve Use Of Cash Collateral.

3. Without the use of cash collateral to pay Debtor's professionals, Debtors will be unable to operate, address litigation claims, and reorganize as this would deny the Debtor the ability to employ and pay critically important individuals, including Jim Vititoe, George Hatcher, Barry Cohen, the company's accountants, and their bankruptcy counsel. The roles and importance of these key players are summarized as follows:

4. **Jim Vititoe** - Jim is the rainmaker for M&V, one of the best in the world, and brings in the millions of dollars in business that allows the firm to succeed. His experience and track record speaks for itself. The firm's financial difficulties were brought about by litigation, as opposed to lack of business. Despite the many millions spent defending the Masry heirs' actions and other cases, Jim has continued to bring in millions upon millions of dollars in business through his contacts, efforts, and expertise around the globe. His services are essential to the continued operations and success of M&V and he must be paid for his efforts.

5. **George Hatcher** - An aviation specialist like George Hatcher, an advisor/consultant/strategist for some of the very most important law firms in the United States, has the experience and knowledge to help clients know what to do after the unthinkable happens. George is not a lawyer, but most of his life has been spent with lawyers, as an independent service provider granting him the freedom to advise without fear of reprisal. In the forty-five years he's been consulting, he's worked on every type of case imaginable and some unimaginable. Small cases, huge cases, wrongful death cases, product liability cases, pharmaceutical cases, train crashes, bus crashes, ship injuries, and many others, including of course, aviation cases.

6. Longstanding inclusion in a close circle of superpower law firms like Girardi and Keese, Engstrom, Lipscomb & Lack, Masry & Vititoe and Podhurst Orseck has been a source of George's on-going education in the warp and weft of behind the scene matters in specialized cases. The combination of his

acceptance into this exclusive legal "peerage", the experts he hires, and his experience has educated him to become a canny expert in diverse areas like aviation crisis management. George maintains a long list of active and retired pilots who are checked out on innumerable types of aircraft. Among other things, when on the job, George determines what is known about the crash. From that point on, he orchestrates significant research and networking. Whether a law firm sends him out on a crash case, or a client is requesting George's help, he goes through a specific checklist of criteria to analyze the case's merit. Additionally, George conferences with his pilots who are checked out in a plane like the one he is investigating to answer model-specific questions that may come up in television interviews, client interviews or when conferring with lawyers. George remains well-informed by primary sources so that he is independent of the buzz and bias of media coverage, and when his clients come to him with questions about what happened, George can provide the most accurate, most up-to-date information.

7.  George's exposure--and that of the attorneys he consults for--is global. For example, lawyers who consult George may ask his specialized opinion (or assistance) on cases the lawyers already know are "good" when they are considering practical issues of geographic feasibility. As an example, he was asked about the feasibility of securing visas and permits to put a team on the ground in, for example, Perm (Russia), Iraq, or the Comoros. Ultimately, he makes his recommendation to the firm about taking on the case. Airline tragedies incur a barrage of email and phone calls from all over the world to George and to lawyers he consults for. Communication alone can be prohibitive--part of the reason why aviation cases are not for everyone. They are costly to take on, and costly to maintain.

8.  When a case calls for special attention, George will advise or interview those families who have requested his help or guidance. In the Tam case of July 17, 2007, George was retained to personally interview 104 families and traveled to Brazil at least 10 times over the course of 12 months. Though he does not offer legal advice (only lawyers do that), he is the source of experiential advice regarding the strategy a family should adopt after tragic circumstance strikes.

9.  Following a plane tragedy, there are often a large numbers of lawyers and runners swarming around the families of victims. Many start knocking on doors and making telephone calls. This is not professional protocol. In fact, in the United States, for the first 45 days following a crash, it is even forbidden by law. George does not knock on doors or make phone calls to people who have not first reached out to him

or a firm he represents. But when clients express need for him, he is there with an ever expanding scope of management services, professional attention, expertise, and care.

10. As the foregoing, and M&V's track record utilizing George's expertise demonstrates, George is a critical element of M&V's success. As a non-owner, outside consultant he must be paid for his time.

11. **Barry Cohen** - Corporate litigation counsel Barry Cohen's continued involvement with the firm is also an essential component of M&V's continued viability. While the Jackie Masry case as against M&V is stayed, the case goes on against several other defendants. Mr. Cohen cannot simply ignore the court hearings and continuing issues on those other defendants (Or, for that matter, the defendants in the other cases) as M&V will not be in Ch. 11 forever, nor can he sit in the background while orders that could possibly seriously affect M&V take place without his input. He must attend these hearings. He has calls waiting for him from plaintiffs' counsel concerning the status of the bankruptcy and the next moves in the case. Also, Dee Yarnall, counsel for other family members/plaintiffs, has approached him at a conference to discuss the case.

12. Even though the action against M&V is stayed, Barry should nevertheless be preparing the case as, absent a settlement, the claim will need to be determined in one court or another. He cannot pick up a file like this a week before trial. The same applies with respect to the litigation with the estate of Edward Masry. He is handling 10 consolidated cases and they need to be worked on for that inevitable day when the stay is lifted or the claims are determined in the bankruptcy court. If these cases are not prepared, then one day the Debtor will be faced with requests for continuing any trial or arbitration dates and there are no guarantees he will be able to get those continuances. Moreover, no attorney can prepare 15 cases for trial overnight.

13. There is also the possibility that any of the attorneys handling the various actions against M&V will seek relief in the bankruptcy court in the form of adversarial complaints or attempts to lift the stay etc. Counsel Financial opposes the use of estate revenues to pay these claims yet offers no solution or strategy as to who will do the necessary work on the cases and how they will be paid.

14. Another case being handled by Barry Cohen, the Gonzalez case, may result in a substantial benefit to M&V and to Counsel Financial as the secured creditor. If Counsel Financial does not want to pay Barry to work on that case and go after Gonzalez for what he owes they will be losing an opportunity to recover their own money.

15. **Bankruptcy Counsel - Leslie Cohen** - M&V's need for bankruptcy counsel to represent it in the chapter 11 case is apparent. The Debtor needs representation to analyze debts, advise and assist in preparation of schedules, represent it in connection with adversary proceedings and contested matters, obtain orders for use of cash collateral an other operational needs, represent it for the meetings with creditors and the US Trustee, formulate and propose a reorganization plan and associated disclosure statement, assist it in the analysis of how to restructure and reorganize, and handle the day to day aspects of being a chapter 11 debtor. Also, Barry Cohen and bankruptcy counsel are currently working closely with insurance company counsel Julie Larsen to obtain an insurance refund estimated at over $300,000. Bankruptcy counsel may be forced to withdraw if it cannot be paid.

16. Debtor is at a loss to understand why Counsel Financial refuses to acknowledge the need for the professionals to be paid. The firms cannot survive if they are required devote the kind of time this case necessitates without payment. Counsel Financial 's proposal to deny compensation to professionals whose services are essential to the Debtor's business and reorganization puts the professionals, as well as the Debtor, in a position of jeopardy and threatens the reorganization.

17. **M&V's accountants** - Again, the need for the involvement of a professional accounting firm is apparent. M&V needs accountants for preparation of tax returns, assistance in preparation of schedules, financial reporting, and complying with Counsel Financial's many requests for financial information. Again, these professionals are entitled to be paid for their services.

18. Counsel Financial's request for financial projections is unreasonable. As shown in Exhibit A, Counsel Financial has requested 'detailed' financial projections indicating exactly when monies will be coming in on the Debtor's contingency fee cases. The information Counsel Financial is asking for is unreasonable; there is no way to predict the specific time a fee will come in or be disbursed. The firm's management can give it a reasoned and experienced estimate, but that is all. As a contingency firm, M&V is experienced in navigating the cash flow uncertainties attendant to its practice and the projections offered to last week are the best it can offer under the circumstances. The Debtor believes that Counsel Financial is aware of this as a financier of numerous large contingency practice firms, and that the use of cash collateral is appropriate, indeed, essential, irrespective of the exact dates on which the monies are received.

1     I declare under penalty of perjury under the laws of the United States of America that the foregoing is
2 true and correct.
3 Executed on this 8th day of September 2009 at Westlake Village, California.

*[signature]*
James Vititoe

# EXHIBIT A

# Leslie Cohen

**From:** Cohen, Cynthia M. [CynthiaCohen@paulhastings.com]
**Sent:** Sunday, September 06, 2009 6:08 PM
**To:** Leslie Cohen
**Subject:** M and V

I reviewed what I received Friday afternoon. I have not yet had a chance to speak to my client, but I myself have a number of comments. As you know, I do not believe in secured creditors paying attorneys or accountants for debtors and I do not see any reason to alter things where you, Barry and the proposed accounting firm are concerned. I do not think it is appropriate for any of you to be in the cash collateral budget. A debtor's bankruptcy counsel and accountant are not the secured creditor's responsibility either during the case or at the end and the case law does not support payment of such fees out of the secured lender's collateral. As for Barry, given the automatic stay that prevents prosecution of litigation against the debtor, it makes no sense to employ him as a general matter and there is no justification for paying him out of Counsel's collateral. In addition, neither Counsel's collateral nor other property of the estate can or should be used to pay him for representing Jim. On the case expenses, I want my client to review those and compare the expenses to the projected fees, if any. I have a question on the aviation cases. If George Hatcher is not associated with the debtor, on what basis is he paid and/or reimbursed for those amounts on the list? On the projected fees, we need the projection broken down by more finite time periods. The first 30 days is almost over. How much has come in, when did it come in, what has been spent and when is the remainder expected? How much cash did the debtor have on the day it filed and was any of that spent for the amounts agreed in the interim order? The next 60 days need to be broken down by week or at least by every two weeks. The expenses need to be matched with cash flow. In addition, two additional interest payments will come due during that 60 days as well as the necessity of paying whatever part of the requisite interest payment is not paid during the first 30 days. We need to assess whether the debtor will have the ability to cure the interest deficiency for the first 30 days and keep interest current. On the non-professional expense I have serious issues with Jim's compensation (draw and expenses) and issues with the extent of auto - related expense (the leases and the miscellaneous such as gas and maintenance), the magnitude of the telephone expenses and expenses for "business meals and lodging and any expense for the public relations firm. Finally, for now, we would like to know what fees came in during the 30 days before the bankruptcy and for what those amounts were expended. Thank you in advance for providing this information prior to the hearing on Wednesday.

---
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)

*************************************************************
IRS Circular 230 Disclosure:    As required by U.S.
Treasury Regulations governing tax practice, you are hereby advised that any written tax advice contained herein was not written or intended to be used (and cannot be used) by any taxpayer for the purpose of avoiding penalties that may be imposed under the U.S. Internal Revenue Code.
*************************************************************

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

For additional information, please visit our website at www.paulhastings.com.

| | |
|---|---|
| 1 | **PROOF OF SERVICE** |
| 2 | I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 506 Santa Monica Blvd. Ste. 200, Santa Monica, California 90401. On September 8, 2009, I served the within document(s) described as: |
| 4 | **SUPPLEMENTAL STATEMENT OF LEGAL AUTHORITIES AND FACTUAL SUPPORT FOR DEBTOR'S MOTION TO APPROVE USE OF CASH COLLATERAL** |
| | on the interested parties in this action as stated on the attached mailing list. |
| | ☒ (BY MAIL) By placing true copies of the foregoing document(s) in a sealed envelope addressed as set forth on the attached mailing list. I am readily familiar with this firm's practice for collection and processing of correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing contained in affidavit. |
| | ☐ (BY EXPRESS MAIL) By placing true copies of the foregoing document(s) in a sealed envelope addressed as set forth on the attached mailing list. I placed each such envelope for collection and overnight mailing following ordinary business practices. I am readily familiar with this firm's practice for collection and processing of Express Mail to be sent overnight by the U.S. Postal Service. Under that practice, it would be deposited on that same day in the ordinary course of business, with Express Mail postage thereon fully prepaid, in a post office, mailbox, sub-post office, substation, mail chute, or other like facility regularly maintained by the U.S. Postal Service for receipt of Express Mail. |
| | ☐ (BY OVERNIGHT DELIVERY) I deposited in a box or other facility regularly maintained by Federal Express, an express service carrier, or delivered to a courier or driver authorized by said express service carrier to receive documents, true copies of the foregoing document(s) in a sealed envelope or package designated by the express service carrier, addressed as set forth on the attached mailing list, with fees for overnight delivery paid or provided for. |
| | ☐ (BY FAX) By transmitting a true copy of the foregoing document(s) via facsimile transmission from this firm's facsimile machine, to each interested party at the facsimile machine telephone number(s) set forth on the attached mailing list. Said transmission(s) were completed on the aforesaid date at the time stated on the transmission record issued by this firm's sending facsimile machine. Each such transmission was reported as complete and without error and a transmission report was properly issued by this firm's sending facsimile machine for each interested party served. A true copy of each transmission report is attached to the office copy of this proof of service and will be provided upon request. |
| | ☒ (BY E-MAIL) By transmitting true copies of the foregoing document(s) to the e-mail addresses set forth on the attached mailing list. |
| | I declare that I am employed in the offices of a member of the State Bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. |
| | Executed on September 8,, 2009, at Santa Monica, California. |

| J'aime Williams | /S/ *J'aime Williams* |
|---|---|
| (Type or print name) | (Signature) |

1

# SERVICE LIST

**Debtor in Possession**
Law Offices of Masry & Vititoe
5707 Corsa Avenue, 2nd Floor
Westlake Village, CA 91362

**U.S. Trustee**
Katherine Bunker
Office of the United States Trustee
21051 Warner Center Lane, Suite 115
Woodland Hills, CA 91367
kate.bunker@usdoj.gov

## Secured Creditors

California Attorney Lending LLC [BY EMAIL]
c/o Cynthia Cohen – Paul Hastings
515 South Flower St, 25th Fl
Los Angeles, CA 90071
cynthiacohen@paulhastings.com

Bank of Whittier [BY MAIL]
15141 East Whittier Blvd
Whittier, CA 90603

## 20 Largest Unsecured Creditors:

Joseph DiNardo [BY EMAIL]
The DiNardo Firm
6400 Main Street #120
Williamsville, NY 14221
jdinardo@counselfin.com

California Lit Funding [BY EMAIL]
c/o Richard Schwartz, Esq.
6351 Owensmouth Avenue # 100
Woodland Hills, CA 91367
raspc@aol.com

Jackie Masry [BY EMAIL]
c/oDelores Yarnall
220 N. Glendale Avenue #103
Glendale, CA 91206
dyarnall@yarnalllaw.com

Louis Masry / Louanne Masry [BY EMAIL]
c/o John Rochefort - Alston & Bird
333 S. Hope Street 16th Floor
Los Angeles, CA 90071
Mark.rochefort@alston.com

Estate of Edward Masry [BY EMAIL]
c/o Louis Masry
c/o John Rochefort - Alston & Bird
333 S. Hope Street 16th Floor
Los Angeles, CA 90071
Mark.rochefort@alston.com

Paul Taing [BY MAIL]
c/o John Carpenter
Carpenter & Zuckerman LLP
8827 W. Olympic Blvd.
Beverly Hills, CA 90211

Chen Shih [BY MAIL]
c/o John Carpenter
Carpenter & Zuckerman LLP
8827 W. Olympic Blvd.
Beverly Hills, CA 90211

Law Offices of Parker Milliken [BY EMAIL]
c/o Rick Robins, Esq.
555 S. Flower Street
Los Angeles, CA 90071
rrobins@pmcos.com
rblessing@pmcos.com

Law Offices of McCurdy & McCurdy [BY EMAIL]
c/o Scot Wert, Esq.
817 Greenview Drive
Grand Prairie, TX 75050
swert@fostersear.com

| | |
|---|---|
| 1    [BY MAIL]<br>AT&T Advertising & Publishing<br>2    PO Box 989046<br>      West Sacramento, CA 95798<br>3<br>      Yellowbook [BY MAIL]<br>4    Post Office Box 3162<br>      Cedar Rapids, IA 52406<br>5<br>      Idearc Media LLC [BY MAIL]<br>6    Post Office Box 619009<br>      DFW Airport, TX 75261<br>7<br>      JKK [BY MAIL]<br>8    5030 Barrier Island Court<br>      Mount Pleasant, SC 29466<br>9<br>      **Special Notice**<br>10   Thomas Geher [BY EMAIL]<br>      tmg@jmbm.com<br>11<br>      Bruce Palumbo [ BY EMAIL]<br>12   Ammirato & Palumbo, LLP<br>      bruce@ammiratopalumbo.com | LexisNexis / lawyers.com [BY MAIL]<br>Post Office Box 894166<br>Los Angeles, CA 90189<br><br>[By Email]<br>Estate of Edward Masry<br>c/o Leib Lerner<br>Alston & Bird LLP<br>333 S Hope St 16th FL<br>Los Angeles, CA 90071<br>Leib.lerner@alston.com |